# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

FILED
2018 JAN 16 AM 9: 52
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 75502-1-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| HUSSAN DRAMMEH, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: January 16, 2018 |
| | ) | |

MANN, J. —Hussan Drammeh was charged with codefendant Rico Lopez with the crime of rape in the first degree. Drammeh accepted a plea agreement and pleaded guilty to rape in the third degree. Prior to sentencing, Drammeh moved to withdraw his plea. The trial court denied the motion. Drammeh appeals and argues that the trial court abused its discretion by denying his motion to withdraw his guilty plea because he received ineffective assistance of counsel. Drammeh also contends that he did not enter his guilty plea knowingly, voluntarily, and intelligently. We affirm.

## FACTS

Early one morning in June 2014, N.L. ran to the front desk at the Jet Motel on International Boulevard and told the desk clerk that she had just been beaten

and raped by two men with guns. N.L., was naked, dripping wet, and bleeding from a head wound. N.L. saw Lopez run by the front window and told the motel desk clerk that "he was the worst one." Lopez was arrested shortly afterwards and read his Miranda[1] rights. Lopez identified the other man as "Saine." Lopez told the responding King County sheriff's deputy that he and Saine had consensual sex with N.L. while she was bleeding from the head, and afterwards Saine "put [N.L.] in the shower to clean her off."

After learning that Saine was Hussan Drammeh, a King County detective arrested Drammeh. Drammeh and Lopez were charged with rape in the first degree.[2]

After his arraignment in November 2014, Drammeh retained defense counsel Timothy Leary. Leary, a former deputy prosecuting attorney, was experienced in handling felony matters, including sex offenses. Leary received and reviewed discovery from the State. Leary met with Drammeh before and after his court hearings and discussed the nature of the charges, the significance

---

[1] Miranda v. Arizona, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).
[2] Under RCW 9A.44.040:
(1) A person is guilty of rape in the first degree when such person engages in sexual intercourse with another person by forcible compulsion where the perpetrator or an accessory:
(a) Uses or threatens to use a deadly weapon or what appears to be a deadly weapon; or
(b) Kidnaps the victim; or
(c) Inflicts serious physical injury, including but not limited to physical injury which renders the victim unconscious; or
(d) Feloniously enters into the building or vehicle where the victim is situated.
(2) Rape in the first degree is a class A felony.

of the penalties Drammeh faced upon a conviction, his review of the discovery including witness statements, and a review of jail call recordings.

The State sought and obtained an order compelling a buccal swab of Drammeh in order to collect a deoxyribonucleic acid (DNA) sample for comparison with the physical evidence collected from the crime scene and the sexual assault examination kit ("rape kit") taken from N.L. The Washington State Patrol Crime Laboratory provided a report detailing its findings with respect to the DNA analysis. Drammeh's DNA matched DNA recovered from swabs of N.L.'s "perineal/vulvar, internal anal, and external anal" areas. The forensic testing estimated the presence of Drammeh's DNA to be accurate such that "[t]he estimated probability of selecting an unrelated individual from the U.S. population with a matching profile [as] 1 in 5.5 sextillion."

Leary believed this evidence was "of great significance, as [it] indicate[d] a strong likelihood that the State would be able to prove that [Drammeh] had sexual contact with N.L., as alleged by the State." Evidence recovered from the crime scene also included N.L.'s blood in Lopez's car, the motel room, and in the motel room's shower. Because N.L.'s head wound required sutures, Leary also believed that the State would be able to prove that serious physical injury was inflicted on N.L. Leary told Drammeh that he believed the State would be able to prove the charge of rape in the first degree.

Leary spoke with Drammeh about the potential for plea negotiations, particularly with the objective to negotiate a "non-Indeterminate" sentence. Drammeh agreed with Leary's approach to plea negotiations. The State sought

input from N.L. and learned that Drammeh was "the less-cruel of the two offenders." Ultimately, Drammeh and the State agreed that Drammeh would plead guilty to rape in the third degree in return for pleading guilty to two counts of identity theft in the first degree in another unrelated criminal matter. On November 20, 2015, Drammeh pleaded guilty to rape in the third degree, and the court accepted the plea. At the time Drammeh entered his plea Leary had only interviewed the law enforcement officers involved in the case. Leary had not yet interviewed the victim, N.L.

In April 2016, before Drammeh was sentenced, Leary and Drammeh learned that the State had dismissed the charge of rape in the first degree against Lopez because N.L. was unavailable to testify. The State "was forced to dismiss the matter" against Lopez because N.L. was undergoing a lengthy inpatient drug treatment program outside of Washington. Because the State did not know when N.L. would be available to testify, it dismissed the charges against Lopez without prejudice. After he learned that the State dismissed the charges against Lopez, Drammeh informed Leary that he wished to withdraw his guilty plea to rape in the third degree. The trial court granted Leary's motion to withdraw as counsel due to Drammeh's decision to move to withdraw his plea. The trial court then denied Drammeh's motion to withdraw his guilty plea. Drammeh was sentenced to a 17-month determinate sentence with 36 months of community custody.

Drammeh appeals.

## ANALYSIS

Due process requires that a defendant's guilty plea be knowing, voluntary, and intelligent. State v. Mendoza, 157 Wn.2d 582, 587, 141 P.3d 49 (2006). This constitutional principle is reflected in CrR 4.2(d). CrR 4.2(d) states that a court "shall not accept a plea of guilty, without first determining that it is made voluntarily, competently and with an understanding of the nature of the charge and the consequences of the plea." The court shall allow the withdrawal of a guilty plea only "to correct a manifest injustice." CrR 4.2(f). This is a demanding standard; under it, the defendant bears the burden of establishing "an injustice that is obvious, directly observable, overt, not obscure." State v. Branch, 129 Wn.2d 635, 641, 919 P.2d 1228 (1996) (quoting State v. Saas, 118 Wn.2d 37, 42, 820 P.2d 505 (1991)). Both the ineffective assistance of counsel and an involuntary plea may constitute a manifest injustice that permits a defendant to withdraw her or his guilty plea. State v. Taylor, 83 Wn.2d 594, 597, 521 P.2d 699 (1974).

*Motion to Withdraw Guilty Plea*

Drammeh argues first that the trial court erred in denying his motion to withdraw his guilty plea because the plea was the product of his counsel's ineffective assistance, namely failing to interview N.L. before Drammeh entered his plea. We disagree.

We review a trial court's order on a motion to withdraw a guilty plea for abuse of discretion. State v. Lamb, 175 Wn.2d 121, 127, 285 P.3d 27 (2012). A trial court abuses its discretion if its decision is manifestly unreasonable or based

on untenable grounds or reasons. Lamb, 175 Wn.2d at 127. We review claims of ineffective assistance of counsel de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

The Sixth Amendment right to effective assistance of counsel encompasses the plea process. State v. Sandoval, 171 Wn.2d 163, 169, 249 P.3d 1015 (2011). In order to establish ineffective assistance, Drammeh must meet the two-part Strickland v. Washington test for ineffective assistance: that Leary's representation fell below an objective standard of reasonableness and that prejudice resulted. Hill v. Lockhart, 474 U.S. 52, 58-59, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985); Strickland, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish prejudice in this context "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59.

When counsel's alleged error is the failure to investigate potentially exculpatory evidence, the determination of whether the error prejudiced the defendant depends on the likelihood that discovering the potentially exculpatory evidence would have led counsel to change his or her recommendation as to the plea. That assessment, in turn, depends on "whether the evidence likely would have changed the outcome of a trial." Hill, 474 U.S. at 59.

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure

of deference to counsel's judgments." Strickland, 466 U.S. at 691. "Effective assistance of counsel includes assisting the defendant in making an informed decision as to whether to plead guilty or to proceed to trial." State v. A.N.J., 168 Wn.2d 91, 111, 225 P.3d 956 (2010). The duty to investigate "does not necessarily require that every conceivable witness be interviewed." In re Pers. Restraint of Davis, 152 Wn.2d 647, 739, 101 P.3d 1 (2004). But a counsel's "failure to interview a particular witness can certainly constitute deficient performance." State v. Jones, 183 Wn.2d 327, 340, 352 P.3d 776 (2015). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

When assessing an attorney's performance during the plea-bargaining stage, "strict adherence" to the Strickland standard is essential. Premo v. Moore, 562 U.S. 115, 125, 131 S. Ct. 733, 178 L. Ed. 2d 649 (2011). This is because plea bargaining is complex and risky. "Plea bargains are the result of complex negotiations suffused with uncertainty, and defense attorneys must make careful strategic choices in balancing opportunities and risks." Premo, 562 U.S. at 124. One risk for the defendant is that an early plea bargain might come before the State finds its case is getting weaker, not stronger. Premo, 562 U.S. at 124-25.

Here, Drammeh's claim for ineffective assistance of counsel fails because he cannot establish prejudice. Drammeh fails to demonstrate that if Leary had interviewed N.L. before entry of the guilty plea, Leary would have changed his

recommendation regarding the plea. Leary's recommendation regarding the plea was unlikely to change because the evidence that N.L. was at least temporarily unavailable to testify would not have changed the outcome. See Hill, 474 U.S. at 59.

First, Drammeh points to no evidence showing that had Leary interviewed N.L. before the plea's entry, he would have changed his recommendation regarding the plea. Drammeh contends that an interview with the victim "could have" shown that (1) N.L. was addicted to drugs, (2) the addiction would eventually require N.L. to attend an out-of-state drug treatment program, and (3) participation in the program would foreclose the possibility of N.L. testifying against Drammeh in a future trial. This contention is unsupported by the record. It is also unreasonable; the Sixth Amendment requires counsel to be reasonably competent, not prescient.

Second, even if we assume that Leary had interviewed N.L. and learned that she would be unavailable to testify, Drammeh cannot show that this would have changed the outcome of a trial. The State's evidence was strong at the time Drammeh entered his plea. For example, the certification for probable cause shows that Drammeh and Lopez knocked N.L. unconscious, brought her into the motel room, and then raped her. N.L.'s blood was found on the motel room's bedding, shower wall, on towels, on Lopez's clothes and face, and in Lopez's car. The motel clerk stated that N.L., bleeding from a head wound and dripping wet, ran up to the desk while screaming that she had been raped and beaten by two armed men. Lopez identified "Saine" as the other rapist and Saine

was later identified as Drammeh. Drammeh's DNA matched the DNA recovered from N.L.'s rape kit. This evidence was, in Leary's professional opinion, "of great significance, as [it] indicate[d] a strong likelihood that the State would be able to prove that [Drammeh] had sexual contact with N.L., as alleged by the State." Although Leary had not yet interviewed N.L. at the time of the plea, he had interviewed the law enforcement officers involved in the case. Drammeh cannot show that an interview with N.L. "likely would have changed the outcome of the trial." Hill, 474 U.S. at 59.

Finally, the charge against Lopez was dismissed without prejudice. As the State argues, the State will be free to refile the rape in the first degree charge against Lopez if N.L. becomes available to testify. State v. Taylor, 150 Wn.2d 599, 602, 80 P.3d 605 (2003). Lopez might yet be charged and convicted of rape in the first degree.[3]

Because Drammeh cannot show prejudice, we need not address his argument that Leary's conduct was objectively unreasonable. See Strickland, 466 U.S. at 697. The trial court did not abuse its discretion by denying Drammeh's motion to withdraw his guilty plea.

### Guilty Plea

Drammeh contends next that he did not enter his plea knowingly, voluntarily, and intelligently because he did not understand the direct consequences of his plea. Specifically, Drammeh argues that he was (1)

---

[3] Under RCW 9A.04.080(b)(iii)(A), the statute of limitations for rape in the first degree will not run until June 18, 2024.

misinformed about the maximum sentence that could be imposed for the charged crime and (2) not informed of the length of the sex offender registration requirement. These arguments are unavailing.

The State implicitly and correctly concedes that this issue may be raised for the first time on appeal. An allegation that a guilty plea was not knowingly made because it was based on misinformation of sentencing consequences is a constitutional error that a defendant can raise for the first time on appeal. State v. Kennar, 135 Wn. App. 68, 72, 143 P.3d 326 (2006).

"A defendant 'must be informed of all the direct consequences of his plea prior to acceptance of a guilty plea.'" A.N.J., 168 Wn.2d at 113 (quoting State v. Barton, 93 Wn.2d 301, 305, 609 P.2d 1353 (1980)). A direct consequence has a "definite, immediate and largely automatic effect on the range of the defendant's punishment." Barton, 93 Wn.2d at 305. For example, "[a] defendant must be informed of the statutory maximum for a charged crime, as this is a direct consequence of his guilty plea." State v. Weyrich, 163 Wn.2d 554, 557, 182 P.3d 965 (2008). "The State bears the burden of proving the validity of a guilty plea, including the defendant's knowledge of the direct consequences of the plea." State v. Knotek, 136 Wn. App. 412, 423, 149 P.3d 676 (2006).

A.    Maximum Sentence

Drammeh argues first that the applicable maximum sentence was the top end of the standard range, not the statutory maximum sentence set out in the statute, RCW 9A.20.021(1)(c). Citing Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531, 159 L. Ed. 2d 403 (2004), Drammeh claims that the trial court

misinformed him when it told him that the maximum sentence for rape in the third degree was confinement for 5 years and a $10,000 fine. Instead, he claims that the top end of the standard range sentence was the true maximum sentence, and the court erred by telling him otherwise.

The State counters that this claim fails in light of Weyrich. In Weyrich, our Supreme Court explained that "[a] defendant must be informed of the statutory maximum for a charged crime, as this is a direct consequence of his guilty plea." 163 Wn.2d at 557. We agree with the State.

Here, Drammeh was correctly informed of the maximum sentence for pleading guilty to the charged crime. Drammeh pleaded guilty to rape in the third degree, a class C felony. A class C felony carries a maximum sentence of 5 years confinement and a $10,000 fine. RCW 9A.20.021(1)(c). Drammeh was informed, in his statement on plea of guilty and in his plea colloquy, that the statutory maximum sentence for rape in the third degree was confinement for 5 years and a $10,000 fine. He was also correctly informed, twice, that the standard range for an offender with an offender score of 2 was 13 to 17 months.[4] The record establishes that Drammeh was correctly informed of the maximum sentence for the crime.

---

[4] At sentencing, Drammeh's offender score was increased to 3 because of an unrelated conviction that he pleaded guilty to before he was sentenced for rape in the third degree.

B.    Length of Registration Requirement

Drammeh argues next that he did not enter his plea knowingly, voluntarily, and intelligently because he was not informed of the length of time that he would be required to register as a sex offender. This argument is also unpersuasive.

Again, a defendant must understand the "direct consequences" of her or his guilty plea. Barton, 93 Wn.2d at 305. A defendant need not, however, "be advised of all possible collateral consequences of his plea. State v. Ward, 123 Wn.2d 488, 512, 869 P.2d 1062 (1994). In Ward, our Supreme Court concluded that the duty to register as a sex offender was not a direct consequence of the guilty plea because it did not alter the standard of punishment. 123 Wn.2d 488, 513-14, 869 P.2d 1062 (1994). Subsequently, however, in A.N.J., the Court explained that Ward did not stand for the proposition that the automatic statutory requirement of registering as a sex offender was not a direct consequence of a guilty plea. A.N.J., 168 Wn.2d at 114-15. But contrary to Drammeh's argument, A.N.J., does not stand for the proposition that a defendant pleading guilty to a sex offense must be informed of the length of the obligation to register. A.N.J., 168 Wn.2d at 115.[5]

Here, like the A.N.J. court, we are not required to decide whether the period of registration is a direct or collateral consequence of a guilty plea because Drammeh, like A.N.J., was informed that he would have to register as a sex offender as required by statute. First, Drammeh signed guilty plea stated

---

[5] The A N J. court concluded it did not need to decide whether the duty to register was a direct consequence of the guilty plea because A.N.J. was correctly informed in his written plea and the trial court's colloquy that he had a duty to register as a sex offender. A N J., 168 Wn.2d at 102, 115.

that "IN CONSIDERING THE CONSEQUENCES OF MY GUILTY PLEA(S), I UNDERSTAND THAT: . . . I will be required to register where I reside, attend school, or work." Second, during the trial court's colloquy Drammeh also confirmed that he understood that he would be required to register for a period of time:

> [STATE]: Do you also understand that you can be required to register as a sex offender for a period prescribed by statute?
>
> [DRAMMEH]: Yes.

Finally, the State's sentencing recommendation stated, under a heading entitled "SEX OFFENDER REGISTRATION," that "Every person convicted of a sex offense is required to register as a sex offender pursuant to RCW 9A.44.130." Because Drammeh was informed of his duty to register as a sex offender he entered his plea knowingly, voluntarily, and intelligently.

Affirmed.

_____
Mann, J.

WE CONCUR:

_____        _____
Trickey, ACJ                           Becker, J.

-13-